U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

SEP 0 8 2005

ROBERT H. SHEMWELL, CLERK
BY _____
                DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

LARRY STEPHEN MCBRIDE, SR.,          CIVIL ACTION
            Plaintiff                SECTION "P"
                                     NO. CV03-0264-A
VERSUS

WILLIAM EARL HILTON, et al.,         JUDGE F. A. LITTLE, JR.
            Defendants               MAGISTRATE JUDGE JAMES D. KIRK


## REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Before the court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983 by petitioner Larry Stephen McBride, Sr. ("McBride") on February 12, 2003. The named defendants are William Earl Hilton ("Hilton") (Sheriff of Rapides Parish), and Brian Frost ("Frost") and Mark Rogers ("Rogers"), both Rapides Parish Sheriff's Deputies. McBride alleges that, on February 13, 2002, Deputies Rogers and Frost used excessive force when arresting McBride, resulting in severe injuries and property damage. For relief, McBride asks for restitution and monetary damages.

Defendants answered the complaint (Doc. Item 18). Frost and Rogers filed a motion for summary judgment with a statement of undisputed facts and documentary exhibits (Doc. Item 38), and Sheriff Hilton filed a motion to dismiss (Doc. Item 39). McBride filed an opposition with a statement of undisputed facts (Doc. Item 48) and an affidavit (Doc. Item 52).

Defendants' motions are now before the court for disposition.

## Law and Analysis

### Sheriff Hilton's Motion to Dismiss

Sheriff Hilton filed a motion to dismiss McBride's complaint for failure to state a claim on which relief may be granted, pursuant to Fed.R.Civ.P. 12(b)(6).

A motion to dismiss for failure to state a claim upon which relief can be granted is generally viewed with disfavor and rarely granted. Tanglewood East Homeowners v. Charles-Thomas, Inc., 849 F.2d 1568, 1572 (5th.Cir. 1988); Doe v. U.S. Dept. of Justice, 753 F.2d 1092, 1101 (D.C.Cir. 1985). For the purposes of such a motion, the factual allegations of the complaint must be taken as true, and any ambiguities must be resolved in favor of the pleader. Doe, 753 F.2d at 1101. A motion to dismiss an action for failure to state a claim admits the facts alleged in the complaint, but challenges plaintiff's right to relief based upon those facts. Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995). In particular, a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Hirras v. National Railroad Passenger Corp., 10 F.3d 1142, 1144 (5th Cir. 1994), vacated on other grounds, 512 U.S. 1231, 114 S.Ct. 2732, 129 L.Ed.2d 855 (1994); Doe, 753 F.2d at 1102. On a motion to dismiss, it is presumed that general allegations embrace

the specific facts that are necessary to support the claim. National Organization for Women, Inc. v. Scheidler, 510 U.S. 249, 114 S.Ct. 798, 803, 127 L.Ed.2d 99 (1994), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992).

McBride named Sheriff Hilton as a defendant in this case, apparently in his capacity as a supervisor since he has not made any specific factual allegations which involve Sheriff Hilton.

The doctrine of respondeat superior, which makes an employer or supervisor liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. §1983. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). Well settled §1983 jurisprudence establishes that supervisory officials cannot be held vicariously liable for their subordinates actions. Supervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury. Mouille v. City of Live Oak, Tex., 977 F.2d 924, 929 (5th Cir. 1992), cert. den., 508 U.S. 951, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993); Thompkins, 828 F.2d at 303.

McBride has not alleged or offered any proof of any acts or omissions of Sheriff Hilton, or any unconstitutional policies implemented by Sheriff Hilton, which deprived McBride of his constitutional rights. Therefore, Sheriff Hilton's motion to

3

dismiss should be granted and McBride's action for damages against Sheriff Hilton should be dismissed.

## Motion for Summary Judgment

### 1. Motion

Frost and Rogers filed a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure mandates that a summary judgment:

> "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [submitted concerning the motion for summary judgment], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Paragraph (e) of Rule 56 also provides the following:

> "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted for purposes of a motion for summary judgment unless the opposing party controverts those facts by filing a short and concise statement of material facts as to which that party contends there exists a genuine issue to be tried.

4

In this regard, the substantive law determines what facts are "material". A material fact issue exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for the plaintiff. Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999), 528 U.S. 906, 120 S.Ct. 249 (1999), and cases cited therein.

If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. Herrera v. Millsap, 862 F.2d 1157, 1159 (5th Cir. 1959). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir.), cert. den., 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

## 2. Facts

In his statement of undisputed facts (Doc. Item 48), McBride states Deputy Rogers entered McBride's home to investigate an

alleged domestic violence complaint on February 13, 2002. McBride shows in his affidavit (Doc. Item 52) that Deputy Rogers entered his home without a warrant or probable cause, asked McBride's wife, son, and son's girlfriend what the problem was several times despite their repeated assertions that there was no problem, and told McBride to go outside, which McBride did. McBride further states in his affidavit that, when they were outside, Deputy Rogers grabbed McBride from behind, so McBride held onto the door frame. Sheriff's Deputy Corporal Frost then arrived and, according to McBride, began to strike McBride on his arms and torso, forcing McBride to release the doorframe; McBride was then thrown to the ground and violently handcuffed by Frost. McBride states Frost then smashed his knee against McBride's head and fractured the orbital bones around McBride's left eye, placed his nightstick under the handcuffs and on McBride's shoulder to lift McBride to his feet, causing "muscular damage" to McBride's shoulder and "nerve damage" to McBride's left hand, threw McBride's eyeglasses across the yard and broke them, then punched McBride in the face. McBride states in his affidavit that he was then taken to the detention center, jerked out of the car onto his tail bone, causing permanent back damage, then flipped onto his stomach and lifted with the nightstick again. McBride states that, when Frost escorted him to his cell, he slammed McBride's head against five doorways as they went through them, then stripped McBride, ruined

6

McBride's $2000 gold chain, and left McBride in an isolation cell, where he stayed for three days before he received medical care. McBride states in his statement of undisputed facts (Doc. Item 48) that, as a result of the incident, he was charged with disturbing the peace, violation of a domestic violence order, resisting arrest, and two counts of aggravated battery on law officers, all of which were ultimately dismissed.

Defendants show, in their statement of undisputed facts (Doc. Item 38), that McBride was found guilty of committing the crime of second degree battery on October 22, 1999, and was sentenced to four years and ten months imprisonment at hard labor. On February 13, 2002, Deputies Rodgers and Frost responded to a report of a disturbance between McBride and his wife, Cindy McBride, and arrested McBride for violating a protective order prohibiting him from communicating with his wife (Doc. Item 38, Ex. 4), disturbing the peace by using offensive language, resisting arrest by violence, and two counts of battery on a police officer; there was also an outstanding arrest warrant for McBride (Doc. Item 38, Ex. 3). Since McBride was on probation at that time, a motion to revoke McBride's probation was filed on the grounds of violating a protective order, disturbing the peace by abusive language, resisting arrest by violence, and committing a battery on a police officer (Doc. Item 38, Ex. 2, pp. 72-77 & Ex. 3), and that motion was granted. The state court judge found McBride had resisted

arrest in a violent manner, apparently finding the deputies'
version of the events more credible than McBride's tale of an
unprovoked attack by the deputies, and revoked McBride's probation
(Doc. Item 38, Ex. 2, p. 103).

### 3. Claim and Issue Preclusion

McBride filed this action against the deputies for use of
excessive force.  In reply, the defendants point to the state
court's findings that there was no justification for McBride's
conduct and the violence of his response to the uniformed officers
(Doc. Item 38, Ex. 2, p. 103), and contend McBride is, essentially,
estopped from asserting this cause of action.  Defendants rely on
the case of Hudson v. Hughes, 98 F.3d 868 (5th Cir. 1996), where
Hudson filed an excessive force claim against arresting officers
after he was convicted of battery of a police officer.  The Fifth
Circuit concluded his claim must be dismissed pursuant to Heck v.
Humphrey, 512 U.S. 477, 114 S.Ct. 2364 (1994), stating,

> "The Supreme Court imposed this requirement on § 1983
> plaintiffs in order to avoid collateral attacks by
> plaintiffs on convictions that are "still outstanding."
> Id. at ----, 114 S.Ct. at 2371 ("We think the hoary
> principle that civil tort actions are not appropriate
> vehicles for challenging the validity of outstanding
> criminal judgments applies to § 1983 damages actions that
> necessarily require the plaintiff to prove the
> unlawfulness of his conviction or confinement, ...")
> (emphasis added).
> "The maturity of a section 1983 claim therefore depends
> on "whether a judgment in [the plaintiff's] favor ...
> would necessarily imply the invalidity of his conviction.
> *        *        *
> "In Louisiana, self-defense is a justification defense to
> the crime of battery of an officer. See LSA-R.S. 14:19;

8

Louisiana v. Blancaneaux, 535 So.2d 1341 (La.App.1988)(discussing justification defense to battery of officer conviction). To make out a justification defense, the criminal defendant charged with battery of an officer must show that his use of force against an officer was both reasonable and necessary to prevent a forcible offense against himself. Blancaneaux, 535 So.2d at 1342. Because self-defense is a justification defense to the crime of battery of an officer, Hudson's claim that Officers Defillo, Hingle, and Lanasa used excessive force while apprehending him, if proved, necessarily would imply the invalidity of his arrest and conviction for battery of an officer. This is true because the question whether the police applied reasonable force in arresting him depends in part on the degree of his resistance, which in turn will place in issue whether his resistance (the basis of his conviction for assaulting a police officer) was justified, which, if it were, necessarily undermines that conviction. We conclude therefore that to the extent that Hudson seeks to recover from the City of New Orleans and Officers Defillo, Hingle, and Lanasa for the defendants' alleged use of excessive force during his arrest, his section 1983 action may not proceed." [Footnotes omitted.]

Hudson, 98 F.3d at 872-873.

The case at bar does not involve a conviction for battery of a police officer;[1] instead, the state court judge found, at the probation revocation hearing, that McBride had resisted arrest, in violation of La.R.S. 14:108, and used violence against police officers to do so. The state court judge concluded that McBride had violated the conditions of his probation sufficiently to warrant revocation and reinstatement of the original 58 month

---

[1] Although McBride was charged with battery of a police officer, there is nothing in the record that shows the disposition of that charge, nor did the state court judge who presided over the probation revocation hearing refer to that charge in his ruling (Doc. Item 38, Ex. 2, pp. 101-107).

sentence of imprisonment. Since a probation revocation is not a final, appealable conviction or judgment, Fed.C.Cr.P. art. 912, to which the principles in Heck would apply, Hudson and the other cases cited by defendants are not applicable to the case at bar.

In deciding the preclusive effect of a state court judgment in federal court, the courts are guided by the full faith and credit statute, which provides that "judicial proceedings of any court of any ... State ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738. Accordingly, the court must look to the state that rendered the judgment to determine whether the courts of that state would afford the judgment preclusive effect. Matter of Gober, 100 F.3d 1195, 1201 (5th Cir. 1996). Also, In re Keaty, 397 F.3d 264, 270 (5th Cir. 2005). In § 1983 cases, federal courts considering whether to give preclusive effect to state court judgments must apply that state's law of collateral estoppel. Quinn v. Monroe County, 330 F.3d 1320, 1329 (11th Cir. 2003), and cases cited therein.

Res judicata is an issue preclusion device found both in federal law and in state law. The original Louisiana doctrine of res judicata was based on a presumption of correctness rather than an extinguishment of the cause of action. A decided case precluded a second suit only if it involved the same parties, the same cause

10

and the same object of demand as the prior suit. However, under La.R.S. 13:4231, as amended in 1990 effective January 1, 1991, a second action would be barred because it arises out of the occurrence which was the subject matter of the prior litigation. The central inquiry is not whether the second action is based on the same cause or cause of action (a concept which is difficult to define) but whether the second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of the first action. This serves the purpose of judicial economy and fairness by requiring the plaintiff to seek all relief and to assert all rights which arise out of the same transaction or occurrence. See Comments--1990, La.R.S. 13:4231, emphasis added. Terrebone Fuel & Lube, Inc. v. Placid Refining Co., 95-0654 (La. 1/16/96), 666 So.2d 624, 631-632.

With the 1990 amendment to the res judicata statute, however, the chief inquiry is whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action. Avenue Plaza L.L.C. v. Falgoust, 96-0173 (La. 7/2/96), 676 So.2d 1077, 1080. Also La.R.S. 13:4231 (1990). Pursuant to La.R.S. 13:4231, a second action is precluded when all of the following are satisfied: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and

11

(5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation.[2] <u>Burguieres v. Pollingue</u>, 2002-1385 (La. 2/25/03), 843 So.2d 1049, 1053.

In applying res judicata principles to this matter, be they federal or state, the first step is to determine what "judgment" exists to act as a res judicata bar. <u>Terrebone Fuel & Lube, Inc.</u>, 666 So.2d at 632. Under Louisiana law, a ruling revoking probation is not a final and appealable judgment under La.C.Cr.P. art. 912. See also, <u>State v. Manuel</u>, 349 So.2d 882 (La. 1977). Since the ruling revoking McBride's probation was not a final judgment under Louisiana law, res judicata, or issue preclusion, does not operate to bar McBride's Section 1983 action on the issue of excessive force.

### 4. Property Damage Claim

McBride filed this claim pursuant to Section 1983 of the Civil Rights Act which provides redress for persons "deprived of any rights, privileges or immunities secured by the Constitution of

---

[2] La.R.S. 13:4232 sets forth exceptions, stating in pertinent part:
A. A judgment does not bar another action by the plaintiff:
(1) When exceptional circumstances justify relief from the res judicata effect of the judgment;
(2) When the judgment dismissed the first action without prejudice; or
(3) When the judgment reserved the right of the plaintiff to bring another action.

12

laws of the United States" by a person acting under color of state law. Accordingly, the initial inquiry and threshold concern of the reviewing court is whether McBride's constitutional rights have been violated. Parratt v. Taylor, 451 U.S. 527, 107 S.Ct. 1980 (1981). The property McBride was allegedly deprived of, the damage to his gold neck chain, can constitute "property" within the meaning of the Due Process Clause of the Fourteenth Amendment, and its loss is worthy of redress if the loss implicates constitutional rights. Parratt v. Taylor, 451 U.S. 527, 107 S.Ct. 1908 (1981). However, the Fourteenth Amendment is not a font of tort law to be superimposed upon whatever systems may already be administered by the States. See Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689 (1979). A constitutional deprivation of property without due process of law, as differentiated from a state tort law claim, must by intentional and plaintiff must allege specific facts which support such a conclusion. "The Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property." Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662 (1986). Moreover, even in instances where intentional deprivation occurs, where an adequate state post-deprivation remedy is available, the Due Process Clause is not implicated. Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 3204 (1984); Lewis v. Woods, 848 F.2d 649 (5th Cir. 1988); Marshall v. Norwood, 741 F.2d 761, 764 (5th Cir. 1984).

13

Louisiana law provides McBride the opportunity to seek redress for his loss, whether intentional or negligent. See La.C.C. art. 2315. Since, McBride's allegations show that his complaint is not cognizable under Section 1983, there are no genuine issues of material fact which would preclude a summary judgment, and defendants' motion for summary judgment should be granted on this issue.

### 5. Excessive Force Claims

Next, the merits of McBride's excessive force claims must be considered, as well as defendants' claim of qualified immunity.

To state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was (3) objectively unreasonable. In gauging the objective reasonableness of the force used by a law enforcement officer, the court must balance the amount of force used against the need for that force. Ikerd v. Blair, 101 F.3d 430, 433-34 (5th Cir. 1996). The amount of force that is constitutionally permissible, therefore, must be judged by the context in which that force is deployed. In gauging the objective reasonableness of the force used by a law enforcement officer, the court must balance the amount of force used against the need for that force. Ikerd, 101 F.3d at 433-434. The amount of force that is constitutionally permissible, therefore, must be

14

judged by the context in which that force is deployed. <u>Ikerd</u>, 101 F.3d at 434. In the Fourth Amendment context, a certain amount of force is obviously reasonable when a police officer arrests a dangerous, fleeing suspect. <u>Ikerd</u>, 101 F.3d at 434.

A police officer may arrest a person if he has probable cause to believe that person committed a crime. <u>Tennessee v. Garner</u>, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699 (1985). Where the officer has probable cause to believe the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given. <u>Garner</u>. 471 U.S. at 11-12, 105 S.Ct. at 1701.

It was clearly established by the Supreme Court in <u>Graham v. Connor</u>, 490 U.S. 386, 109 S.Ct. 1865 (1989), that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. <u>Saucier</u>, 533 U.S. at 201-202, 121 S.Ct. at 2156. Therefore, McBride has alleged the violation of a constitutional right that was clearly established in 2002.

In <u>Graham</u>, the Supreme Court set forth a list of factors relevant to the merits of a constitutional excessive force claim,

15

requiring careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. If an officer reasonably, but mistakenly, believes that a suspect is likely to fight back, for instance, the officer would be justified in using more force than in fact was needed. The qualified immunity analysis then adds a further dimension: if an officer's mistake as to what the law requires is reasonable, the officer is entitled to qualified immunity. Saucier v. Katz, 533 U.S. 194, 201-202, 121 S.Ct. 2151, 2156 (2001). Saucier, 533 U.S. at 204-205, 121 S.Ct. at 2158.

Also, a plaintiff asserting an excessive force claim is required to show he suffered at least some form of injury. The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed.[3] Glenn v. City of Tyler, 242 F.3d 307, 314 (5th Cir. 2001); Williams v. Bramer, 180 F.3d 699, 703-704 (5th Cir.), clarified on rehearing, 186 F.3d 633 (5th Cir. 1999).

McBride alleges that, as a result of Frost's and Rogers' use of excessive force against him, he suffered fractured orbital bones

---

[3] To state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need, and the excessiveness of which was (3) objectively unreasonable. Ikerd, 101 F.3d at 433-34.

around his left eye, muscular damage to his shoulder, nerve damage to his left hand, and permanent damage to his back. McBride also alleges property damage (to his eyeglasses and gold neck chain), which will be discussed below. McBride has alleged a more than de minimis injury, which defendants have not disputed.

Defendants argue they are entitled to qualified immunity.

The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident. Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084, 116 S.Ct. 800 (1996). Qualified immunity cloaks a police officer from personal liability for discretionary acts which do not violate well established law. Officers have qualified immunity if their actions could reasonably have been thought consistent with the right they are alleged to have violated. Richardson v. Oldham, 12 F.3d 1373, 1380-81 (5th Cir. 1994), and cases cited therein. Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful. Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2515 (2002).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

"The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law."

Bazan v. Hidalgo County, 246 F.3d 481, 489 (5th Cir. 2001), citing Salas v. Carpenter, 980 F.2d 299, 306 (5th Cir. 1992).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional rights; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right. This analysis is made under the currently applicable constitutional standards. Hare, 135 F.3d at 325. A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent. Officials must observe general, well-developed legal principles. Doe v. Taylor Independent School Dist., 15 F.3d 443, 445 (5th Cir.), cert. den., 513 U.S. 815, 115 S.Ct. 70 (1994).

The second prong of the qualified immunity test is better understood as two separate inquiries: (1) whether the allegedly violated constitutional rights were clearly established at the time of the incident and, if so, (2) whether the conduct of the

18

defendants was objectively unreasonable in the light of that then clearly established law. Hare, 135 F.3d at 325-36. Objective reasonableness is a question of law for the court. The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits). For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under that standard (the minimum standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine whether, as a matter of law, they were objectively unreasonable. Hare, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct. Douthit v. Jones, 619 F.2d 527, 533 (5th Cir. 1980). A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm to him, or took an action which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result. Douthit, 619 F.2d at 533.

Defendants show, in their statement of undisputed facts (Doc. Item 39), that their use of force against McBride was objectively reasonable, their actions were made necessary by McBride's

resistance to a lawful arrest, they did not intend the consequences of their actions, they were unaware McBride was in need of medical care, and McBride was afforded adequate medical care at Huey P. Long Hospital.

The testimony from McBride's probation revocation hearing (Doc. Item 38, Ex. 2) shows Deputy Rogers responded to a report of a domestic disputed at Cindy McBride's home (Doc. Item 38, Ex. 2, p. 11). After the Deputy Rogers asked McBride to step outside, in an effort to separate him from his wife, McBride cussed at Officer Rogers and tried to reenter the house, which Deputy Rogers tried to prevent McBride from doing and a physical altercation ensued between Deputy Rogers and McBride which did not end until Corporal Frost arrived to assist Deputy Rogers (Doc. Item 38, Ex. 2, pp. 12, 14-16). With Corporal Frost's assistance, McBride was handcuffed; as they were putting McBride in Deputy Roger's vehicle, McBride spit in Frost's fact (Doc. Item 38, Ex. 2, p. 17). When McBride complained that his glasses were about to fall off and he didn't want to lose them, Deputy Rogers took them off of McBride and placed them in the bed of McBride's truck (Doc. Item 38, Ex. 2, p. 62). Deputy Rogers testified that he turned McBride over to other officers at Detention Center 1, and never left the parking lot (Doc. Item 38, Ex. 2, p. 63). Deputy Rogers stated he believed the domestic violence restraining order, ordering McBride to refrain from contact with Cindy McBride, was still in effect, knew McBride

has a lengthy history of violence, and knew there was an outstanding arrest warrant for McBride (Doc. Item 38, Ex. 2, p. 16).

Corporal Frost testified that, when he went as back-up for Rogers at the McBride residence, he was aware of McBride's history of violent crimes (Doc. Item 38, Ex. 2, p. 21). When Frost arrived, he saw Deputy Rogers struggling with McBride under the carport; McBride was attempting to get away from Deputy Rogers by pushing, tugging, and throwing his forearms (Doc. Item 38, Ex. 2, p. 22). Frost assisted Rogers in getting McBride to the ground, then used his baton as a control device to get one hand, then the other, from under McBride and hand-cuffed (Doc. Item 38, Ex. 2, p. 22). As they were about to place McBride into Rogers' patrol car, McBride smiled and spit into Frost's face (Doc. Item 38, Ex. 2, pp. 22-24). Frost testified that he did not remove McBride from the patrol car by jerking him out by his feet, as alleged by McBride (Doc. Item 38, Ex. 2, p. 65). On cross-examination, Frost testified that he escorted McBride into the jail, where three or four other officers took custody of McBride and placed him in a cell (Doc. I53m 38, Ex. 2, pp. 66-67, 69).[4] Later, a jailer reported that McBride had made threatening comments about Corporal

---

[4] Although McBride asked Frost about placing his baton under McBride's handcuffs to walk McBride in (Doc. Item 38, Ex. 2, p. 69), McBride did not ask Frost any questions about slamming Frost against doorways and walls as he escorted him in the jail (Doc. Item 38, Ex. 2, pp. 69-71).

Frost (Doc. Item 38, Ex. 2, p. 24). Frost also testified that McBride had pushed him, shoved him, hit him with his elbow, and spit into his face (Doc. Item 38, Ex. 2, p. 29).

Deputy Mark Thomas testified that, when he was escorting McBride in the hospital, McBride stated that an officer had battered his eye and he would not be held responsible for his actions if something was not done to that officer; Deputy Thomas reported to his supervisor that McBride had threatened an officer (Doc. Item 38, Ex. 2, pp. 31-32, 33). Deputy Thomas further testified that Cell No. 10 at Detention Center 1 is used to house combative prisoners (Doc. Item 38, Ex. 2, pp. 33-34).

Deputy Jasper Bay testified that he lives in Cindy McBride's neighborhood and, on January 25, 2002, he witnessed McBride hitting his son with a bat and heard McBride threaten to kill wife, son, and other family members (Doc. Item 38, Ex. 2, pp. 39-40). Deputy Bay also testified that, about three weeks later, he saw McBride parked down the street from his house, apparently watching his house, at 2:00 a.m.; when he asked McBride about it later in the day, McBride became enraged (Doc. Item 38, Ex. 2, p. 43). Deputy Bay testified he had frequently witnessed McBride swearing and cursing officers in uniform, and that McBride began to harass Deputy Bay at his home after these incidents (Doc. Item 38, Ex. 2, pp. 43-44).

McBride testified that he exited Cindy McBride's house when

22

Deputy Rogers told him to, but when Deputy Rogers did not answer him when he asked whether he was under arrest, McBride tried to go back into the house (Doc. Item 38, Ex. 2, pp. 84-85). Deputy Rogers then grabbed McBride by the arm and tried to walk him to the front yard, so McBride held onto the door casing and tried to pull away (Doc. Item 38, Ex. 2, p. 85). McBride admitted struggling with Deputy Rogers, stating he would have quit struggling and submitted if Deputy Rogers had told him he was under arrest (Doc. Item 38, Ex. 2, p. 85). McBride also testified that Deputy Rogers laid on top of him when he finally got McBride on the ground; when McBride was unable to get his left arm out from under him to allow them to handcuff it, Corporal Frost tried to use his baton to pry his left arm out, but Rogers finally had to get off of McBride so he could pull his arm out for cuffing (Doc. Item 38, Ex. 2, p. 86). Frost then put his baton under the cuffs and walked McBride on his tip-toes to the patrol car (Doc. Item 38, Ex. 2, p. 86). When McBride complained his glasses were falling off, Frost took them and threw them across the yard (Doc. Item 38, Ex. 2, p. 86). McBride admitted spitting in Corporal Frost's face (Doc. Item 38, Ex. 2, p. 87), explaining he did so because, while McBride was lying on the concrete to be handcuffed, Frost put his knee on the side of McBride's head, which fractured his eye socket, and later yelled at McBride from about six inches away from McBride's face (Doc. Item 38, Ex. 2, p. 87). McBride testified that, after he

spit into Frost's fact, Frost forcefully shoved McBride into the car (Doc. Item 38, Ex. 2, p. 87). When they arrived at the jail, there were several other deputies standing there, and "they" pulled McBride out of the car by his feet, causing him to land on the concrete on his backside; Frost then put his baton under McBride's handcuffs to lift him to his feet and walk him into the jail (Doc. Item 38, Ex. 2, p. 88). McBride testified that, on the way in, Frost rammed McBride's head into the door out of the garage, the elevator door, the booking room door, all down the hall to his cell, the cell door, and then the back wall of the cell, saying "excuse me" each time (Doc. Item 38, Ex. 2, p. 88). Finally, McBride denied cussing publicly or to the officers, although he admits he became loud during the incident. McBride explained he resisted arrest because he had not been told he was under arrest so he was not going to go with them voluntarily, and explained that he did not commit a battery on a police officer because he never used a closed fist to hit them, but only scuffled with them and struck them with his elbows (Doc. Item 38, Ex. 2, pp. 92-95).

According to McBride, his muscular injuries (caused by the Frost's baton under his cuffs) as well as the orbital fracture (when Frost put his knee against the side of McBride's head to subdue him while Rogers handcuffed him) were all caused by Corporal Frost. Since there are no genuine issues of material fact which would preclude a summary judgment in favor of Rogers, Roger's

motion for summary judgment should be granted on the basis of qualified immunity, and McBride's action against Rogers should be dismissed with prejudice.

As to the claims against Frost, it is noted that, except for the back injury, all of McBride's injuries occurred at Cindy McBride's house while Rogers and Frost were attempting to arrest and subdue McBride; McBride admitted that he struggled and resisted arrest, apparently in the mistaken belief that he had the right to resist since they had not told him he was under arrest and the reasons therefor. McBride also appears to believe that the fact that he did not use a closed fist against Rogers and Frost indicates he was not actually fighting with them. By his own admissions, McBride violently resisted arrest and had to be forcibly subdued by Rogers and Frost. From the facts as described by McBride, he was injured in the altercation he started when he resisted arrest; there is no indication that McBride's injuries were caused by the use of excessive force. Instead, McBride must bear responsibility for his injuries incurred in a conflict he initiated.

McBride also alleges he suffered a back injury when he was pulled from the patrol car by his feet, causing him to fall out of the car and land on his tailbone. McBride testified at his probation revocation hearing that, when they arrived at the jail, there were several other deputies standing there and "they" pulled

McBride out of the car by his feet (Doc. Item 38, Ex. 2, p. 88).
Since McBride's own testimony shows that Frost did not pull McBride
from the car (an allegation which Frost denied), and that other
officers did, McBride's claim against Frost for back injuries
should be denied, also.

Since there are no genuine issues of material fact which would
preclude a summary judgment in favor of Frost, Frost's motion for
summary judgment should be granted on the basis of qualified
immunity, and McBride's action against Frost should be dismissed
with prejudice.

### Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that
Sheriff Hilton's motion to dismiss be GRANTED, that Rogers' and
Frost's motion for summary judgment be GRANTED on the basis of
qualified immunity, and that McBride's action be DISMISSED WITH
PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and
Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from
service of this Report and Recommendation to file specific, written
objections with the Clerk of Court. A party may respond to another
party's objections within **ten (10) days** after being served with a
copy thereof. A courtesy copy of any objection or response or
request for extension of time shall be furnished to the District
Judge at the time of filing. Timely objections will be considered

26

by the district judge before he makes a final ruling.

A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of September, 2005.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE